UNITED STATES DISTRICT COURT

SUFFOLK, S. S.                                    EASTERN
MASSACHUSETTS DIVISION
                                                 Docket No.:

BENJAMIN TARIRI,
        Plaintiff

V.

MASSACHUSETTS STATE LOTTERY COMMISSION,

&"
MARK WILLIAM BRACKEN,
individually and officially,
&
John Sweeney,
Individually and officially,

&
SMART PLAY INTERNATIONAL, INC.,

Defendants.

---

## COMPLAINT AND DEMAND FOR JURY TRIAL

---

Benjamin Tariri (" Plaintiff "), respectfully, brings this action to complain about the unlawful actions of Massachusetts State Lottery Commission, Mark William Bracken,  John Sweeney, and SMART PLAY INTERNATIONAL, INC., ( collectively referred to as the " Defendants", and individually referred to as the " Defendant," in connection with the Defendants' fraud and misrepresentation, as well as gross negligence, and other intentional and negligent acts concerning the sale of lottery tickets to Plaintiff. As the result of the Defendants' unlawful actions, Plaintiff has suffered substantial monetary, physical, and emotional damages.

## JURISDICTION

This Court has jurisdiction under 28 U.S.C. Section 1332(a).

## VENUE

1

Venue is proper in the Eastern Massachusetts Division of U.S. District Court.

## PARTIES

1. Plaintiff, Benjamin Tariri resides in Boston, Massachusetts.
2. Defendant Massachusetts State Lottery Commission has its headquarters at 150 Mt. Vernon Street, Boston, Massachusetts.
3. Defendant Mark William Bracken , is the interim Executive Director of Defendant  Massachusetts State Lottery commission, and also resides in Massachusetts.
4. Defendant John Sweeney was the Commissioner for Defendant Massachusetts State Lottery Commission and on information and belief resides in Massachusetts.
5. Defendant has its headquarters located in State Of New Jersey.

## PRODEDURAL HISTORY

1.      Plaintiff repeats and realleges the above paragraphs as though more fully stated herein.

## JURISDICTION

2.      Plaintiff repeats and realleges the above paragraphs as though more fully stated herein.

3.      Jurisdiction is proper under Massachusetts General Laws, Chapter 223A, Section 3(c).

## PROCEDURAL HISTORY

4.      Plaintiff repeats and realleges the above paragraphs as though more fully stated herein.

5.      On July 24, 2024, as required, Plaintiff served a Presentment Claim, which is identical to the contents of this complaint upon the office of Massachusetts Attorney General via the email provided by the State of Massachusetts.

6.      On July 26, 2024, Plaintiff received an acknowledgement from the Office

of Massachusetts Attorney General that the Defendant has received Plaintiff's Presentment of Claim and all Exhibits attached to it. A copy of the receipt email is enclosed and marked as **Exhibit A.**

7.     On Sept. 18, 2025, Plaintiff, via certified mail, served the Defendant with a Demand Letter pursuant to MGL c 93A, Section 9. In the letter, Plaintiff thoroughly described the issues as provided herein, and provided the Defendant with 30 days to respond or face the specter of treble damages.

8.     To date, Plaintiff has not received a response the Presentment Claim or the 93A Demand Letter from anyone on the Defendant's side.

## FACTS COMMON TO ALL COUNTS

9.     Plaintiff is a 67- year old man who has three children.

10.     Plaintiff started purchasing lottery tickets from Defendant as far back as the year 2012.

11.     Plaintiff began to seriously play what is known as Mass Lottery Numbers Game and scratch tickets in or about 2017.

12.     Plaintiff, who in 2012 was faring financially quite well began buying scratch tickets as well as playing the Numbers Game, as a hobby, which quickly became a daily habit for him.

13.     Plaintiff continued to regularly purchase daily lottery tickets of all types, including but not limited to the Numbers games and various scratch tickets from Defendant as from 2017 to as recently as August of 2023 "a.k.a. "Playing Years."

14.     During these Playing Years, Plaintiff would play the daily numbers game twice a day and would also purchase high-cost scratch tickets such as $30.00 tickets.

3

15.    In 2012, Plaintiff was running a highly successful law practice in the City of Boston. His practice comprised of numerous employees and multitudes of clients from all walks of life.

16.    At the time, Plaintiff was earning approximately $300,000 a year from his law practice. He owned a 7-bedroom house in Cambridge, Massachusetts, which he sold in 2012 for over $3 Million dollars. That house was subsequently sold for $6,850,000 and is currently valued by Zillow at almost $7,400,000. At the time, he had also acquired a free-standing 4-story brick building across the Boston Municipal Court at 15 Portland street. He also had signed a purchase contract for the entire sixth floor of a commercial condominium at 100 Street, in Boston. Furthermore, aside from his successful and lucrative law practice, Plaintiff was a 33% co-owner of a company called "Jobs for Massachusetts", which at the time was valued at about $2 million dollars.

17.    In 2012, two of Plaintiff's three sons were attending a prestigious private school in Cambridge. Plaintiff owned a Mercedes Benz while his wife was driving a new Lexus SUV. Plaintiff also owned a cornucopia of antique furniture and paintings which adorned his house in Cambridge, Mass.

18.    Once the Plaintiff went through a divorce, he was forced to sell the marital home and liquidate all his belongings. He also began to purchase lottery tickets from the Defendant.

19.    At about this time, also one of his children, his youngest son who was 9 years old began to experience multiple illnesses, necessitating numerous hospitalizations. It is reasonable to assume that his child's health problems at the time could be largely attributed to the divorce of his parents, with had unsettled his quiet

4

life.

20.    Plaintiff began to experience emotional hardship due to the divorce, his child's sicknesses, and a drop in his revenue due to playing the lottery, which was sponsored by the Defendant.

21.    In fact, during this period, Defendant began to increasingly advertise, directed at Plaintiff and individuals like him that encouraged playing the lottery with the promises that he could hit the jackpot big and soon. He began to spend hundreds of dollars a day playing the lottery (scratch tickets as well as daily Numbers Game).

22.    During the same period, Plaintiff began to experience further financial downturn in his profession largely due to his heavy lottery-purchase spending, which then began to snowball into a $300-to-$1,000-a-day habit.

23.    By 2017, the Defendant fully knew that Plaintiff was profusely engaged in heavy gambling.

24.    Defendant took no steps to stop or prevent Plaintiff from gambling. By contrast, indeed Defendant began to accelerate its targeting of Plaintiff by further direct advertising thus making it easier for Plaintiff to play.

25.    In fact, Plaintiff had registered his name on the Defendant's website ("MA Lottery Second Chance Club)", which aimed to promote Plaintiff from a casual player to a high-stakes gambler (VIP player). His status even as of today's date is one of a VIP Player with Mass Lottery.

26.    Plaintiff would continue to enter his losing scratch ticket numbers on the website with hopes of winning $1,000,000.00. By that time, Plaintiff had purchased at least tens of thousands of scratch ticket, and on several occasions, Defendant would issue a few $100 checks made out to Plaintiff's name which it would send to

his house.

27.     Between 2017 and 2023, Plaintiff met with the Defendant's officials at their headquarters in Dorchester, Massachusetts at least five (5) times in order to discuss his gambling habit as well as to collect his winnings, which were always immediately repaid back to the Defendant in order to enable Plaintiff to further gamble. Most of the times, Plaintiff would play between $900 to $2,000 per day.

28.     In one of the meetings with Defendant's officials, a man in charge of lottery internal security called him to his office and asked him how much and where Plaintiff usually played. The man explained that he wanted to see if Plaintiff was present in the store when he played the Numbers game. He also explained that "we have asked all the vendors to have cameras so that we would know [and see] who is playing and for how much." Plaintiff responded that he went to different vendors, which the Defendant refers to as its Agents. According to Defendant's website it has over 500 agents in the state of Massachusetts. The man then took down Plaintiff's telephone number and his residential address. By this time, Defendant clearly knew that Plaintiff had become a gambling addict.

29.     Defendant never advised Plaintiff to seek mental health help concerning his addiction, nor took any other action to ameliorate Plaintiff's gambling addiction.

30.     At all times relevant, Defendant knew that Plaintiff's gambling was not just playing "for fun." In fact, they knew how much and how often he played and even to which lottery agent Plaintiff would go and purchase his tickets.

31.     Defendant is well-equipped in conducting its lottery business, and has required its lottery agents to install cameras in all their stores so that Defendant would know who was purchasing tickets.

6

32.     Defendant has also required all its agents to accept Only cash, not check or IOUs or any other form of payment from the players. Lastly, Defendant, in its Rules and Regulations (including 961 CMR 2: Rules and regulations) had required that all purchases to be in person and no texts or calls were allowed to place bets or purchase instant tickets.

33.     Defendant continued to urge the Plaintiff to purchase even more and more lottery tickets despite the fact that Defendant could see that the Plaintiff was struggling and was heavily in debt.

34.     This fact became very apparent when Plaintiff contacted the Defendant informing it that one of its agents had taken his winning money because he had played on credit and was unable to pay until he won enough money to recoup part of his losses. Defendant knew that Plaintiff owed at least $8,000 to just that one agent at that time.

35.     The store in question was located on Main Street, in Everett, Massachusetts.

36.     As the result of Plaintiff's claim, the Defendant sent an investigator to the Agent's store and also interviewed all involved, including the Plaintiff. The Defendant's investigator knew that the Plaintiff was an addict who was playing upwards of $1,800 a day at the Agent's store. The investigator or the Defendant took no action to address the Plaintiff's obvious gambling addiction.

37.     By 2017, gambling had become a way of life for the Plaintiff. He was simply consumed with the thought of gambling, during his waking hours as well as even in his dreams he was consumed by gambling. In fact, he began to physically, shudder, and experience twitches every time he would think about gambling, which

7

by now it was 24 hours a day, 7 days a week.

38.    Since at least 2017, Plaintiff began to experience weight loss as he began to neglect the most basic human necessities such as food and well being. He began to not being able to pay his rent (where he lived with his young son) or for that matter his daily sustenance and subsistence.  He also cut down on all his necessary expenses including food, health, and the like.

39.    In the meantime, Plaintiff continued to take his son who was ill from one hospital to another. In all, his son has become hospitalized on at least 45 separate occasions. By now, Plaintiff was literally barely able to pay for anything.

40.    At this point, Plaintiff began to heavily borrow from his friends and even acquaintances to support his gambling addiction. Virtually all of the Plaintiff's money was going promptly and directly to the Defendant on a daily basis where he would pay the Defendant's agents in cash or via Zelle or other forms of payment,

41.    On more than one occasion, the Plaintiff did not even have any money to play.

42.    In fact, one of the Agents ultimately filed a complaint against Plaintiff for nonpayment which was dismissed after a year in court.

43.    Defendant was regularly able to call in or text his numbers to the Defendant's agents even though Defendant's own rules prohibited such activities and strictly required in-person playing.

44.    Suffering from hallucinations including day-dreaming, anxiety, depression but also undue optimism, Plaintiff continued to play the lottery unabated.

45.    On numerous occasions, over the Playing Years, Plaintiff sought professional help, including attending Gamblers' Anonymous as well as in person

8

therapies by licensed practitioners. He was diagnosed to suffer from severe Pathological Gambling (DSM—IV) (312.13).

46.    The practitioners who examined the Plaintiff had determined that Plaintiff had met the Diagnostic criteria for 312.13 Pathological Gambling. He is now regularly attending therapy for his addiction,

47.    Aside from direct marketing and encouragement of the Plaintiff, Defendant continued to advertise heavily on radio, print, TV, Social media, subway cars, buses, as well as in every super market and convenience store throughout the Commonwealth.

48.    As of September of 2023, everywhere Plaintiff turned there was the Defendant luring him to gamble by making him give any money he had in his pocket or in his bank account directly to the Defendant.

49.    In 2023, the Plaintiff's youngest son, who was now 17 years old passed away, adding to the deep sorrows of his father, the Plaintiff,

50.    In 2023, also Plaintiff was evicted from his apartment as well as from his law office.

51.    Plaintiff, already under tremendous pressure due to his finances, multiple evictions, his young son's deteriorating health and ultimate death, saw no option but to continue to play 7 days a week without reprieve or respite. All he had to do was call in or even text his numbers to the vendor (Defendant's agent) and if that vendor would not accept his bet because Plaintiff owed him money, Plaintiff would move on to a different vendor who would.

52.    For years, Plaintiff had not eaten properly, pay rent on time, have medical insurance or see a doctor, buy clothes, or even fix his old (2004) car or even help pay

for his son's college tuition while he continued to play with his funds as well as borrowed funds and pay the Defendant nonstop.

53.    Plaintiff continued to have faith in the Defendant's intentions. After all, he thought, the Defendant agency was run by the State and that it would not lie or cheat or do anything to harm its citizens.

54.     Plaintiff was diagnosed to be suffering from obsessive compulsive gambling.

55.     In 2023, when Plaintiff lost his young son, he became even more distraught and helpless, yet he continued to gamble and give even more money to Defendant.

56.     As the result of Defendant's actions, Plaintiff subsequently suffered the loss of his law license as well as two incarcerations both of which were directly related and in fact caused by Plaintiff's addiction and Defendant's actions. (One was for contempt of court and another was for charges against the Plaintiff concerning finances).

57.     Over the years, Plaintiff had become suspicious of the Defendant's questionable conduct in the manner it was running the games and the manner it was luring players to play.

58.     Upon intensive investigation by Plaintiff, he became convinced that the Defendant indeed had ill intentions towards its constituents.  He realized that Defendant's only and main goal was to make money from its citizens, no matter the toll on the subjects.

59.     Even Defendant's own website readily admits that it was created solely "in response to the need for revenue." (See: WWW.MASSLOTTERY.COM: "The Massachusetts State Lottery Commission was established by the legislature in 1971 in response to the need for revenue."). Emphasis added.

## A.  INSTANT (SCRATCH)  TICKETS

60.     In and about the year 2016, Plaintiff started buying even more expensive

scratch tickets such as $20 or $30-tickets on a regular basis.

61.    From early 2018 to mid-year in 2021, including March 1, 2020, Plaintiff purchased various scratch tickets including a new $30-scratch ticket called "200 X." (hereinafter referred to as the "200 X Ticket"). A copy of a sample 200X ticket (front and back) is enclosed and marked as **Exhibit B**.

62.    Over the course of these two years, Plaintiff purchased hundreds, even thousands of the 200X tickets as well as other scratch tickets

63.    The main and only reason the 200 X Ticket appealed to the Plaintiff was because the following words were conspicuously written in blue and pick on the top front of the Ticket: "WIN UP TO $15,000,000!" Emphasis in original. *See* Exhibit A

64.    Convinced by the words of the Defendant as stated above Plaintiff became truly intrigued and encouraged by the written words of the Defendant that if he paid the Defendant $30, he would have a chance of winning $15,000,000.00.

65.    Once Plaintiff started buying the 200 X Ticket, he also read on the Ticket that he had an estimated "chance of winning a prize of 1 in 2.78!" Emphasis in original. *See* Exhibit B.

66.    Plaintiff correctly assumed that by this "chance of winning" Defendant meant that he would have a reasonable chance to win at least some prize.

67.    Plaintiff's belief in this "chance in winning" was further amplified by the Defendant's own words in pink on the Ticket, which read: "est. 80.7% payout!" Emphasis in original. *See* Exhibit A.

68.    Plaintiff believed the Defendant's words on the 200 X Ticket and decided to buy a ticket by paying the lottery agent the amount of $30.00 in cash.

69.     After Plaintiff scratched that ticket, he discovered that he did not win anything. He then purchased five more tickets from the same roll of tickets. All of them were losers. He had just spent $180, and received not even a dollar in return.

70.     But that did not stop him from buying yet another 200 X Ticket that day and the following days.

71.     In fact, Plaintiff then began buying the 200X Ticket on a regular basis with the hope of winning the $15 million jackpot.

72.     Plaintiff had become very optimistic that he had found the scratch ticket which could lead him out of the financial rut he was experiencing, or at the very least, he would have a very high chance of winning a million dollars.

73.     The reason for Plaintiff's optimism was due to Defendant's effective multi-media marketing campaign, which especially promoted the chance of winning the $15-million-dollar prize.

74.     Plaintiff became particularly and exclusively enticed to buy the 200X Ticket because on the face of the ticket, it read in highly-conspicuous bold blue lettering: "WIN UP TO $15,000,000! "

75.     Plaintiff was quite excited because Defendant had virtually told him that he had a chance to win the grand prize of $15 Million Dollars. While Plaintiff did not expect to actually win the $15Million prize by buying the ticket, he assumed that at least he be given a chance, albeit a remote one.

76.     Plaintiff believed that if only he purchased enough tickets, he could increase his chances of winning the $15-Million-dollar grand prize as advertised.

77.     Plaintiff continued to buy several  200X Tickets, at $30 each every day.

78. In the years 2018-2021 (up to August of 2020, Plaintiff spent every dollar he had on buying as many 200X Tickets as well as other tickets.

79. He also played the Numbers Game heavily on a daily basis from 2018 up to September of 2023.

80. Even when Plaintiff did not have money, he would borrow money from others to buy more tickets.

81. Every store Plaintiff went to, he could see the 200 X Ticket with advertising "Win Up to $15,000.000.00!"

82. Plaintiff felt that he was very close to finding the ticket with the Jackpot of $15 Million Dollars.

83. In the year 2018, Plaintiff would buy the 200X Ticket every day starting from Jan. 1, 2018 to August 20, 2021 (hereinafter referred to as the "Period").

84. During this period, Plaintiff was working almost 7 days a week in order to satisfy the insatiable needs of the Defendant for money.

85. During this period, Plaintiff would purchase the 200X tickets from several stores including a store in Belmont, Massachusetts.

86. Plaintiff would buy these tickets on a daily basis before, during or after he would finish his work.

87. As time went by, Plaintiff would owe more and more to his friends and others because of his purchases of the 200 X Tickets and the other games.

88. However, Plaintiff felt that he was "so far in the hole that the only way out" was "to buy more to finally win and come out on top."

89. On August 10, 2020, Plaintiff entered the Convenience Store in Belmont,

14

and purchased ten 200 X Tickets. As he scratched them he discovered, not

surprisingly, as he had always done before, that he had not won the $15-million dollar

grand prize.

90.    In fact, Plaintiff did not even win $30 dollars that day, the price of the

200 X Ticket itself, despite the fact that he had bought ten tickets in a row.

91.    Plaintiff still has many of the 200X tickets, although he has discarded

countless others.

92.    To Plaintiff's chagrin, it turned out that unbeknownst to Plaintiff, the

$15-million-dollar jackpot had been claimed almost nine months earlier.

93.    During the Period, no one had informed the Plaintiff or anyone else that

there was no $15 million dollars for him or any one else to win.

94.    In fact, for most of the year 2020, there was no $15-million dollar jackpot.

95.    Yet, Defendant failed to notify the Plaintiff or the public that the jackpot

had been won.

96.    Every time Plaintiff entered the Belmont store or other stores, he never

saw a single sign nor anyone informed him that the $15 million Dollar ticket had been

sold already.

97.    Defendant did not (and has not) place any warnings or notices anywhere

in the store or any other store that $15-million dollar jackpot had been won, leading to

Plaintiff to keep buying the 200 X Tickets with the hope of winning the $15-million-

dollar jackpot.[1]

98.    On August 19, 2020, Plaintiff for the first time found out through someone (not

---

[1] In fact, as it turns out, until recently, Defendant has always failed to notify the consumers that a top prize has been won.

the Defendant) who informed him that the last $15-million prize had indeed already been claimed a long time ago.

99.    Defendant had not informed anyone nor advertised anywhere in the stores, on TV, or any other media that the Jackpot had been won.

100.    When he found out, Plaintiff felt violated, taken advantage of by the Defendant.

101.    The first line on the 200X Ticket clearly stated that Plaintiff could "Win Up to $15,000,000!" That was the **only** reason that Plaintiff was purchasing these tickets.

102.    Plaintiff then began reading the back of the 200X ticket. It read that

ALL HOLDERS, TICKETS AND TRANSACTIONS SUBJECT TO LOTTERY COMMISSION RULES AS PUBLISHED IN THE MASSACHUSETTS REGISTER AND THE ADMINISTRATIVE BULLETIN ISSUED THEREUNDER.

103.    At this time, Plaintiff went to the Defendant's website at:WWW.MASSLOTTERY.COM. .

104.    Once on the Defendant's website, Plaintiff clicked on the tab for "Instant Tickets".

105.    On Aug. 19, 2020, the first thing that he saw on this page of Defendant's Website was a picture of the 200X Ticket with the number conspicuously displayed: :$15 million" A copy of the Page of the Defendant's website is enclosed and marked as **Exhibit C.**

106. He then clicked on the tab as was shown on Exhibit B. Again, it showed a page with clear and conspicuous writing: "$15 Million." A copy of the Page of the Defendant's website is enclosed and marked as **Exhibit C.**

107. Up until Aug. 19, 2020, Plaintiff had never seen or anything either at the various convenience stores or anywhere else to alert him that the $15 Million Dollar Jackpot had been claimed.

108. Up until Aug. 19, 2020, Plaintiff had never seen any information either at the Convenience store or other various lottery vendors or anywhere else to alert him that he would need to go the Defendant's Website to see if the $15 Million Dollar Jackpot had been claimed.

109. Had Plaintiff known that the $15 Million Dollar Jackpot had been claimed, he would not have spent a penny, let alone every last dollar that he had and had borrowed on these tickets.

110. Plaintiff was not interested in winning anything less than $15 Million Dollars, which was advertised on the ticket itself.

111. As of the date of this complaint, Plaintiff had spent more than $100,000.00 on the 200X scratch tickets alone.

112. Plaintiff now owes hundreds of thousands of dollars to others from whom he had borrowed in the hopes of winning the $15-Million Jackpot.

## B. THE NUMBERS GAME

113. From 2012 to 2017, Plaintiff had been moderately playing the Massachusetts Numbers Game. Until then, on average, he would spend about $20 to $30 a day on the daily Numbers Game.

114.    In the years from 2017 to 2023, due to Plaintiff's addiction caused by the Defendant's actions including intense advertising, facilitating, he began to heavily immerse himself in the Numbers Game.

115.    Because of Defendant's actions, Plaintiff became financially ruined and emotionally devastated.

116.    The Numbers Game is drawn by the Defendant twice a day, which is currently at 2 PM and 9 PM.

117.    The objective is to choose one or more digits of a 4-digit number in any combination. The final number will be a 4-digit number.

118.    The winner will be the person who chose the correct numbers.

119.    The Player is supposed to go to a store, and hand the Agent his bet slip and his cash, and the Agent would enter the Player's number into the Defendant's lottery machine.

120.    The betting stops minutes before the drawings but by that time the Defendant through its lottery machine, which is a highly sophisticated computer system already knows what numbers the Players have bet on.

121.    According to the Defendant's website, the Game drawings are televised live on TV as well as on Youtube.

122.    The drawing consists of 40 white balls in 4 cylinder-shaped tubes (10 balls in each tube). Each tube contains 10 balls numbered from 0 to 9 imprinted on them.

123.    The formation (the placement) of the balls in each tube is determined by a computer.

124.    The machine starts floating the balls in each tube in the air simultaneously.

125.    The tubes then stop in tandem by the left tube stopping first and churning

18

out a ball, followed by the second tube, and so on.

126. Once all the 4 tubes have churned out a ball, the numbers are shown.

127. It is noteworthy that the Defendant's machine already possesses the information ("knows") which numbers the Players have bet on.

128. Defendant has never informed the public, namely the Players, that before it conducts its final drawings on live TV, it conducts 3-4 drawings inhouse, which is not televised.

129. Defendant's practice is akin to a unfair game of raffle drawing where they would spin 3-4 times and pull out a name or number each time. Then on the 5th drawing, the winner is picked.

130. On its website, Defendant claims that "the odds of winning is 1 in 10,000."

131. However, given the fact that those odds are based on best-drawn in a natural environment, i.e., without any additional pre-drawings, by the time the actual drawing takes place the odds have increased to at least 1 in 100,000.

## COUNT I:

## FRAUD AND MISREPRESENTATION (INSTANT/SCRATCH TICKETS)

132. Plaintiff repeats and realleges the above paragraphs as though more fully stated herein.

133. During the period of Jan. 1, 2020-Aug.19, 2020 (hereinafter referred to as the "Period") Defendant intentionally misrepresented that if Plaintiff purchased the 200 X Ticket, he would have a chance to win $15,000,000.00.

19

134.    During the Period, or at any time before Aug. 19, 2020, Defendant knew that there was no $15-Million-Dollar ticket in its 200 X Ticket series.

135.    During the Period, every time that Plaintiff stepped into the Belmont store or any other store which carried the 200 X Ticket, he never saw a single warning that the $15-million dollar jackpot had been won.

136.    In fact, during the Period, Defendant did not provide any notice or warning to Plaintiff either at the store or otherwise readily available information that the $15-Million ticket had already been sold and was no longer available.

137.    During the Period, by contrast, Defendant falsely represented to Plaintiff that the $15 Million-dollar-ticket was indeed still available through its information provided on the Ticket as well as in the stores where Plaintiff purchased the tickets.

138.    More particularly, on Aug. 10, 2020, at about 4 PM, Plaintiff walked into a Convenience store located in Belmont, Massachusetts.

139.    On that day, Plaintiff saw a 200 X Ticket behind the clerk's counter at the Store.

140.    On that day, Plaintiff could read that the 200 X Ticket stated that "Win Up to $15,000,000!"

141.    On that day, Plaintiff handed the clerk $300.00 in cash and purchased ten 200 X Tickets.

142.    At this time, Defendant knew that there was no $15-million prize to be won by Plaintiff or by anyone else. It had been claimed months earlier.

143.   Plaintiff promptly scratched the 200 X Tickets, which he had just purchased. To his chagrin, he did not win the $15-million-dollar prize.

144.   During the Period, to present, Defendant has never notified Plaintiff or otherwise provided reasonable notice that the $15M ticket had in fact been sold long ago.

145.   During the Period, and on that day in August (August 10, 2020), Plaintiff justifiably relied on the Defendant's representations when he purchased the 200 X Tickets.

146.   During the Period, Plaintiff used his hard-earned money and also borrowed money in order to purchase the 200X Tickets in the hopes of winning the $15M-jackpot.

147.   By inducing Plaintiff to buy the 200 X Tickets when there was no Jackpot, but failing to inform the Plaintiff of this material fact, Defendant committed fraud and misrepresentation which caused him to lose large sums of money.

## COUNT II:

## FRAUD AND MISREPRESENTATION (THE NUMBERS GAME)

148.   Plaintiff repeats and realleges the above paragraphs as though more fully stated herein.

149.   During the period of Jan. 1, 2017-September 1, 2023 (hereinafter referred to as the "Numbers Period") Defendant intentionally committed fraud on the

Plaintiff by misrepresenting and manipulating the Numbers Game so that Plaintiff would not have a fair chance to win.

150.    During the Numbers Period, and namely on Jan 1, 2022, Defendant engaged in actions to defraud the Plaintiff.

151.    On Jan. 1, 2022, Plaintiff placed bets on several numbers at a Convenience store in Belmont, Mass. His numbers were not chosen during the drawings on that day.

152.    On its website, WWW.MASSLOTTERY.COM Defendant had posted the odds of winning of four digits in the Numbers Game as "one in 10,000". In other words, a player had a chance of one in 10,000 to hit the winning number. For example, if the player picked a four-digit number such as 5627, that number would have a 1 in 10,000 chance to come out.

153.    Defendant had always advertised that the drawing for the Numbers Game would be two times a day and that it was live and could be watched on TV or on Youtube.  However, Defendant failed to inform the Plaintiff or the public that it was also drawing the numbers by spinning the balls three or four times before the actual drawing on live TV.

154.    In other words, Defendant would conduct 3-4 drawings immediately before it would conduct and show the final drawing on TV or to an audience.

155.    By doing so, by using the same balls that had just been drawn 3-4 times, Defendant would effectively destroy the mathematical chances as it had advertised on its own website. It was akin to playing the cards game in a black jack where the

22

dealer would first draw 3-4 cards and look at them and then and only then would deal cards to the players.

156.    The fact that this method was clearly in violation of the fairness of the game was never shared with Plaintiff or the public.

157.    Plaintiff, nonetheless, was able to gain access to these drawings and even film the procedure once in person.

158.    By doing so, the Defendant would increase the odds of winning from 1 in 10,000 to at least 1 in 100,000.

159.    This was clearly false advertising and fraudulent behavior.

160.    By inducing Plaintiff to play the Numbers Game while failing to inform him that the chances of winning were drastically reduced by the multiple drawings before the final drawing, which was a material and indispensable fact, Defendant committed fraud and misrepresentation which caused Plaintiff to lose large sums of money.

## COUNT III:

## FRAUD AND MISREPRESENTATION (THE NUMBERS GAME, ELECTRONIC MANIPULATION OF BALL PLACEMENT, SPEED, ETC.)

161.    Plaintiff repeats and realleges the above paragraphs as though more fully stated herein.

143.    During the period of Jan. 1, 2017-September 1, 2023 (hereinafter referred to as the "Numbers Period") Defendant intentionally committed fraud on the

Plaintiff by misrepresenting and manipulating the Numbers Game so that Plaintiff would not have a fair chance to win.

144.    During the Numbers Period, and namely on Jan 1, 2022, Defendant engaged in actions to defraud the Plaintiff.

145.    On Jan. 1, 2022, Plaintiff placed bets on several numbers at a Convenience store in Belmont, Mass. His numbers were not chosen during the drawings on that day.

146.    By placing bets through the Defendant's Lottery machine located in its Agent's store, Defendant immediately transmitted to its headquarters and notified them that Plaintiff had placed a bet on a certain number.

147.    During its drawing that same day, Defendant allowed the computer which already knew what number Plaintiff had played, after drawing 3-4 times, to choose the formation (placement) of the balls in the tube, as well as the speed of the machine that would spin and dislodge the balls. The same computer would even choose the weight and temperature of each tube as well as the timing and frequency of each winning ball. In other words, Defendant had undue control over the balls as well as a tremendous and unfair pre-knowledge of what numbers should not be drawn.

148.    This was clearly fraudulent activity and false advertising.

149.    By inducing Plaintiff to play the Numbers Game while engaging in activity that would drastically reduce the chances of drawing the Plaintiff's number, Defendant committed fraud and misrepresentation which caused Plaintiff to lose large sums of money.

## COUNT IV

## BREACH OF CONTRACT

150.    Plaintiff repeats and realleges the above paragraphs as though more fully stated herein.

151.    Plaintiff and Defendant had entered into a contractual relationship.

152.    Defendant had offered its products for sale including the Scratch tickets as well as the Numbers Game, and Plaintiff had accepted the offer and paid good and valuable consideration to purchase same.

153.    The Contract also consisted of the promise in the Offer that if Plaintiff purchased a 200X Ticket, he would stand a chance to win "Up to $15,000,000.00."

154.    When Plaintiff accepted the Offer, he reasonably assumed that he would have a chance to win $15,000.000.00.

155.    The Contract also consisted of the promise in the Offer that if Plaintiff placed a bet on the Numbers Game, he would have a fair chance of winning according to the odds as posted on its website.

156.    When Plaintiff accepted the Offer, he reasonably assumed that he would have a chance of winning the jackpot as promised on Defendant's website.

157.    Defendant breached its contract with Plaintiff when it failed to notify Defendant prior to his multiple purchases over the span of many months that there was indeed no $15-Million-Dollar prize.

25

158. Defendant also breached its contract when it manipulated the odds of winning as well as unlawfully controlled the process by which the numbers were chosen.

## COUNT V

## VIOLATION OF MGL C 93A, SECTION 9

159. Plaintiff repeats and realleges the above paragraphs as though more fully stated herein.

160. Defendant is engaged in trade or commerce in the State of Massachusetts.

161. Plaintiff is a consumer in the State of Massachusetts.

162. An act or practice is unfair and deceptive within the meaning of the Massachusetts Consumer Protection Act if it is "oppressive or otherwise unconscionable in any respect".

163. An entity violates the Massachusetts Consumer Protection Act when it "fails to disclose to a buyer or prospective buyer any fact, the disclosure of which may have influenced the buyer or prospective buyer not to enter into the transaction"; and

164. An entity violates the Massachusetts Consumer Protection act if it "fails to comply with existing statutes, rules, regulations or laws, meant for the protection of the public's health, safety, or welfare," or if it "violates the Federal Trade Commission Act, the Federal Consumer Credit Protection Act or other Federal consumer protection statues with the purview of G. L. ch. 93A, § 2."

165. On Sept. 18, 2025, Plaintiff, via certified mail, sent a 30-day Demand letter to Defendant, outlining the Defendant's fraudulent activity, and requesting a response or resolution.

166. Defendant simply ignored Plaintiff's Demand letter and did not respond.

167. By engaging in deceptive and fraudulent activities, Defendant has engaged in unfair and deceptive trade or practice.

168. As the result of Defendant's actions, Plaintiff has suffered actual damages as well as incidental and consequential damages.

## COUNT VI

## ADDICTION

169. Plaintiff repeats and realleges the above paragraphs as though more fully stated herein.

170. The Defendant created an environment, which caused the Plaintiff to become severely addicted to gambling.

171. Plaintiff only played the games offered by the Defendant and does not play at casinos or other gambling facilities.

172. Defendant directly caused, aided, promoted, encouraged, and facilitated the gambling process for Plaintiff to the degree that Plaintiff became pathologically addicted, and unable to stop.

173. Had it not been for the Defendant's actions, Plaintiff would not have gambled and nor would he have become a gambling addict.

174. DSM-IV (1994) defines Pathological gambling as " a persistent and recurrent maladaptive gambling behavior (Criterion A) that disrupts personal, family, or vocational pursuits."

175. Since the year 2012, Defendant engaged in every action to cause Plaintiff to become addicted.

176. In fact, once the Plaintiff became pathologically addicted, Defendant

27

increased its efforts to keep Plaintiff gambling, and even would periodically send Plaintiff $100 checks in order to keep him interested and focused on the game.

177. As the result of Defendant's actions, Plaintiff became a severely afflicted gambler who spent his days and nights engaged in the gambling world by continuing to play day and night and by even losing sleep and not paying rent and incurring massive financials losses.

178. In 2023, Plaintiff lost his law license due to allegations of misappropriation and was even incarcerated. He also lost his young son while he was engaged in gambling activity.

179. Plaintiff had practiced law for two decades when he unduly lost his bar license.

180. Defendant is liable for causing Plaintiff to become addicted to gambling, which has led to massive financial losses, family disintegration, even criminal charges as well as incarceration.

## COUNT VII

### AGENCY (RESPONDEAT SUPERIOR)

181. Plaintiff repeats and realleges the above paragraphs as though more fully stated herein.

182. On its own website and in its Rule and Regulations, Defendant refers to the vendors who sell its lottery tickets as its "Agents."

183.    As Defendant's "agents," these individuals (or companies) acted as representatives of the Defendant.

184.    These agents were acting under the control and supervision of the Defendant.

185.    In fact, Defendant had issued licenses to these agents and was at all times relevant vigilantly monitoring and regulating their conduct.

186.    Over the years, especially from 2017 onward, these agents, under the auspices of Defendant had allowed the Plaintiff to purchase or play the games at their respective stores.

187.    At all times relevant, Defendant was overseeing the process by which the Plaintiff was playing or purchasing tickets. In fact, Defendant was even able to watch via cameras installed in the store to see if and how Plaintiff played.

188.    Plaintiff often played on credit as well as played by calling or texting the vendor (agent). Defendant was well aware of these activities and clearly condoned it.

189.    Plaintiff would even visit Defendant's headquarters in to cash some tickets which he had purchased from the Defendant's agents.

190.    Due to the Agent and Defendant's actions, Plaintiff became addicted and also lost massive amounts of money.

191.    Defendant is liable for all the physical, financial, and mental damages, which it has caused Plaintiff directly and through its agents.

## COUNT VIII

### BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

192.    Plaintiff repeats and realleges the above paragraphs as though more fully stated herein.

193.    When Plaintiff purchased the 200X Ticket and paid the Agent $30, Plaintiff and Defendant had entered into a valid contract.

194.    When Plaintiff played the Numbers game and paid the Agent for the amounts of bets, Plaintiff and Defendant had entered into a valid contract.

195.    Massachusetts law implies a covenant of good faith and fair dealing in all contracts between parties entered into in the State of Massachusetts.

183.    Defendant breached its covenant by failing to inform Plaintiff that the wording of "WIN UP TO $15,000,000! "printed on the top of every 200X Ticket was an untruth, a lie.

184.    Defendant breached its covenant by failing to inform Plaintiff that it was manipulating the machines and also running the drawings 3-4 times prior to the actual final drawing, and that it had influenced the formation of the balls and their speed prior to the spinning leading to a substantial increase in the odds of the game.

185.    Defendant also breached its covenant by causing Plaintiff to become addicted to gambling to the degree that he constantly played for many years, paying Defendant upwards of hundreds of thousands of dollars and leading to the loss of all his assets, his family, and his profession.

## COUNT IX

## QUANTUM MERUIT

196.    Plaintiff repeats and realleges the above paragraphs as though more fully stated herein.

197.    When Plaintiff purchased the 200X Ticket and paid the vendor $30, and when he paid for lottery tickets Plaintiff provided a valuable service to Defendant.

198.    When Plaintiff paid Defendant in order to play the Numbers Game, he provided a valuable service to Defendant.

199.    In return, Plaintiff expected that by providing such service to Defendant, Defendant would receive a chance to win $15,000,000.00 or a fair chance to win in his other games.

200.    Defendant failed to provide a chance to win $15 Million dollars because there was no such a chance.

201.    Plaintiff suffered when he spent every last dollar as well as every dollar that he could borrow on purchasing the 200X Tickets as well as the other tickets in the false hope of winning $15,000.000.00, or being treated honestly and fairly by the Defendant.

## COUNT X:

## NEGLIGENCE

202.    Plaintiff repeats and realleges the above paragraphs as though more fully stated herein.

203.    Defendant, as the seller of a product had a duty of care towards Plaintiff as

31

a purchaser that its product would perform as it was expressly advertised.

204.    Defendant had advertised that a purchaser of its 200X Ticket would be afforded a chance to win $15,000,000.00.

205.    Defendant breached its duty of care when it failed to inform Plaintiff that there was no $15-Million-Dollar Ticket, and that the Jackpot had already been claimed long time ago.

206.    Defendant also breached its duty of care when it intentionally manipulated the Numbers Game to the detriment of Plaintiff.

207.    Plaintiff suffered when he spent every last dollar as well as every dollar that he could borrow on purchasing the 200X Tickets as well as the other tickets in the false hope of winning $15,000.000.00, or being treated honestly and fairly by the Defendant.

## COUNT XI:

## MONEY HAD AND RECEIVED

208.    Plaintiff repeats and realleges the above paragraphs as though more fully stated herein.

209.    Plaintiff's records and other evidence show that to date, Defendant has received at least upwards of 2 million dollars from Plaintiff in purchases of 200 X Tickets, other scratch tickets, as well as the Numbers Game tickets.

210.    These funds spent by Plaintiff, were obtained by him largely from his own assets, through hard work, as well as through loans from others.

211.    Plaintiff invested these funds on reliance of receiving a return in the form

32

of a chance of winning $15,000,000.00, or in the case of the Numbers Game, to be treated honestly and fairly.

212.    These funds do not belong to Defendant as they were procured through fraud and deceit and should be returned to Plaintiff forthwith.

213.    Plaintiff requests that the Defendant be ordered to deliver these funds to the Plaintiff, along with interest at the prevailing rate.

214.    Plaintiff requests that the Defendant be ordered to also pay the statutory amount of $100,000 for its actions under the MTCA.

## COUNT XII:

## UNJUST ENRICHMENT

215.    Plaintiff repeats and realleges the above paragraphs as though more fully stated herein.

216.    As a result of the above-described actions, Defendant has been unjustly enriched at the Plaintiff's expense in the amount of at least Two (2) Million Dollars plus interest.

## COUNT XIII:

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

217.    Plaintiff repeats and realleges the above paragraphs as though more fully stated herein.

218.    The Defendant's conduct in misrepresenting the fact that there was never a $15-Million Dollar Jackpot during the Period or at the very least several months before Aug. 19, 2020, continuously inducing the Plaintiff to purchase 200X Tickets

33

as well as encouraging and enticing Plaintiff to play the Numbers Game although Defendant was manipulating the game as described above, was intentional.

219. The Defendant's conduct in failing to immediately notify the Plaintiff that there was no $15 million -Dollar 200X Ticket, and therefore no chance of winning same, and stopping the manipulation of the Numbers Games as described above, was extreme and outrageous.

220. The Defendant's conduct in allowing the Plaintiff to time and again, for months, to purchase the 200X tickets despite Defendant's knowledge that the Jackpot had long been won already, and that the Numbers Game process was being unfairly manipulated, was reckless.

221. The Defendant's conduct has caused and was the direct cause for the Plaintiff's emotional distress.

222. The Defendant's conduct has resulted in the Plaintiff's loss of all his funds as well as borrowed funds and has resulted in developing an acute form of Pathological Gambling Disorder under DSM-IV for which he is now under the care of health professionals.

223. The Defendant's conduct has resulted in the Plaintiff's severe emotional distress, which has been diagnosed as Pathological Gambling, where he has become an addict and is now acutely paranoid and suffers from multiple symptoms including deep anxiety and sleepless nights.

COUNT 14

DEFENDANT SMART PLAY INTERNATIONAL, INC.'S INTENTIONAL AND NEGLIGENT ACTS

1.Plaintiff reavers and realleges the above paragraphs as more fully stated herein.

2. At all times relevant Defendant SMART PLAY INTERNATIONAL, INC. was the operator and manufacturer of the system which was running Defendant ML's lottery drawings.

3. Defendant SMART PLAY INTERNATIONAL, INC. knew or should have known that its products were designed to defraud the consumers, who were the intended targets of its system.

4. Defendant is jointly and severally liable for all the Damages inflicted upon the plaintiff.

COUNT 15.

FRAUD IN INDUCEMENT (ADDICTION)

1.Plaintiff reavers and realleges the above paragraphs as more fully stated herein.

2. Defendants knew or should have known that their system, drawings and machines were designed to cheat the end users, the consumers.

3. Defendants actively pursued a strategy of encouraging, enticing, and inducing the consumers into purchasing despite the fact that they knew their system, procedures were faulty.

4. By misrepresenting as well as omitting material which would have afforded the consumers to make an informed decision.

COUNT 16

NEGLIGENT MISREPRESENTATION BY OMISSION

1.Plaintiff reavers and realleges the above paragraphs as more fully stated herein.

2. As the operator and manufacturer s of the Defendants' system and machines, the Defendants were well aware of the negative qualities of the system which amounted to cheating the consumers.

3. Defendants had a duty of care towards the consumers

4. Defendants breached their duty of care to include in their information, which they shared with consumers the fact that the system, procedures, and programs were faulty, and were intended to cause the consumer to unfairly lose.

5. By breaching their duty of care the Defendants harmed the Plaintiff in a substantial manner.

COUNT 17

36

FAILURE TO WARN

1.Plaintiff reavers and realleges the above paragraphs as more fully stated herein.

2. At all times relevant, Defendants knew that their product was highly addictive and therefore harmful to the consumers.

3. Defendants had a duty of care towards the Plaintiff who was not just a consumer, but was also a member of the same State, over which Defendants had absolute power and control

4. Defendants had a duty warn the Plaintiff of the clear and present danger that the lottery posed to a long-term addict such as the Plaintiff

5. Defendants breached their duty to warn Plaintiff of this danger.

6. By their breach, Defendants caused Plaintiff substantial harm.

COUNT 18

CONSPIRACY/ ACTING IN CONCERT

1.Plaintiff reavers and realleges the above paragraphs as more fully stated herein.

2. All of the Defendants knew that their actions, their programs and procedures would cause irreparable harm to Plaintiff.

37

3. Defendants acted in unison to ensure the Plaintiff would not only lose his funds but also would continue to play even when he did not have any money to play.

4. By acting in concert, Defendants irreversibility caused damage to Plaintiff.

COUNT 19

RESPONDEAT SUPERIOR (AGENCY)

1.Plaintiff reavers and realleges the above paragraphs as more fully stated herein.

2. Defendant ML has designated the vendors who sell the lottery as its "Agents."

3. In every literature of Defendant, it refers to the sellers as Agents.

4. As the superior to these Agents, Defendant ML has control over time, place, and manner where lottery can be sold by its Agents.

5. The Agents are even monitored by camera to ensure they are compliant with the Defendant ML's rules, regulations, and procedures.

6. If an Agents violates any of the Defendant's rules, regulations, or policies, even a minor one, the Agent can be immediately held to account, and his or her license will be subjected to suspension or revocation.

7. This is very much unlike licensing by the other governmental agencies where the regularly process is rather passive.

8. As the result, Defendant ML knew when an Agent violated its rules.

9. Defendant ML also knew that Plaintiff was clearly addicted to lottery.

10. By failing to act to prevent , and in fact by encouraging the Plaintiff to continue playing despite the fact that he was playing on credit as stated above, Defendant ML acted in concert with its Agent, and is equally responsible for its actions, therefore it is liable for all damages suffered by the Plaintiff.

PLAINTIFF'S PRAYERS FOR RELIEF

_____

WHEREFORE, Plaintiff prays for judgement against the Defendants as follows:

a. Immediately reimburse all the funds which the Defendants received from the Plaintiff;

b. Compensate Plaintiff for injuries caused by the Defendants as described in this complaint;

c. Pay Plaintiff actual, incidental, consequential, statutory, and punitive damages for injuries, directly or indirectly caused by the Defendants;

d. Pay Plaintiff's attorney and legal fees, prejudgement interest, and costs; and

e. Any other relief, which this honorable Court deems just and proper.

PLAINTIFF HEREBY RESPECTFULLY REQUESTS A TRIAL
BY A JURY ON ALL MATTERS SO TRIABLE.

DATED: JUNE 29, 2026

39

Respectfully submitted,
Benjamin Tariri, Pro Se
Plaintiff
Email: BTARIRI@YAHOO.COM

Ben Tarirl

40